UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
PECOS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Case Number P-25-CR-00173 |
| | § | |
| JAVIER ALEJANDRO GAMBOA VALADEZ | § | |
| *Defendant.* | § | |

## CORRECTED MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

TO THE HONORABLE DAVID COUNTS:

### I.    Introduction

Javier Alejandro Gamboa Valadez moves to suppress evidence obtained as a result of his detention and arrest, including post-arrest statements made to law enforcement officers. In resolving this Motion, the Court must address whether the evidence and statements were obtained in violation of the Constitution.

Gamboa Valadez was driving a van on I-20 when he was stopped by Reeves County Sherriff Lt. Michael Jurado.  Lt. Jurado, utilizing the Flock vehicle surveillance system, was suspicious of the van based on its pattern of travel between Texas and Atlanta, Georgia.  Lt. Jurado stopped the van based on the assertion that Gamboa Valadez had been following another vehicle too closely in violation of Texas traffic laws. However, Lt. Jurado made no effort to ticket Gamboa Valadez or issue him a warning for following too closely.  Instead, Lt. Jurado placed Gamboa Valadez in his patrol car and asked him and his co-defendant a series of questions unrelated to the asserted reason for the stop. After approximately 16 minutes of questioning unrelated to asserted reason for the stop, Lt. Jurado asked for permission to search the van, to which Gamboa Valadez consented.    During a later search, drugs were discovered.  The Motion to Suppress implicates several issues for this Court's consideration:

1

1.  Whether the stop was lawful at its inception?

2.  Whether the government's warrantless use of a private company's national automated vehicle surveillance and data collection system to capture the details of every car that drives by for purposes of proactive general criminal investigation violates the Fourth Amendment?

3.  Whether the officer's subsequent actions were reasonably related in scope to the circumstances that initially justified the stop?

4.  Whether the duration of the seizure was impermissibly extended?

**5.**  Whether Gamboa Valadez's consent was voluntarily and freely given and was an independent act of free will?

## II.     Factual Summary[1]

Reeves County Sheriff's Lt. Michael Jurado was proactively monitoring his Flock[2] vehicle surveillance system while working drug interdiction near the I-10 and I-20 junction in late July 2025, when he observed a white van with a Chihuahua, Mexico, license plate EPH738B traveling westbound while towing an empty car dolly.  *See* Exhibit 3.  Lt. Jurado made a license-plate database enquires across multiple license plate reader databases which revealed that the van had previously made several trips to the Atlanta, Georgia area in the month of July 2025.  *Id*. He believed that this pattern of travel could be consistent with alien or drug smuggling. *Id*. On August 13, 2025, Lt. Jurado was again working criminal

---

[1] The facts stated herein are taken from Lt. Jurado's reports and from Lt. Jurado's body-worn camera.  The body camera footage is filed in conjunction with this Motion as "Exhibit 1."  A partial English-language transcript of the relevant Spanish-language portions of the video is attached as "Exhibit 2."   Exhibit 1 contains an embedded time-stamp in hour:minute:second format.  Exhibit 2 refers to the time of the dialog when played from the beginning of the video in hour:minute: second format.   Lt. Jurado's report is attached as "Exhibit 3."

[2] Flock is an automated vehicle tracking system marketed by Flock Safety, a private company.   The system is described in greater detail infra.  The system is marketed for purchase to law enforcement agencies throughout the United States. *See* https://www.flocksafety.com/privacy-ethics (last visited on 10/4/25).

interdiction operations from his stationary position on I-20 when he observed the same van driving eastbound while traveling in tandem with a black passenger van that was pulling an empty utility trailer. Lt. Jurado also had information from Homeland Security Investigations that that the two vans were associated with one another based on their past travels. *Id.* Lt. Jurado left his stationary location and drove to catch up with the white van, when he allegedly observed the white van commit a state traffic violation of following too close.[3]

Lt. Jurado conducted a traffic stop on the white van and his interactions with Gamboa Valadez were preserved on video. *See* Exhibit 1. Gamboa Valadez was the van's driver and his co-defendant, Jose Benjamin Hernandez, was the passenger. Lt. Jurado approached the passenger window of the van and asked Gamboa Valadez and Hernandez for their license and identification documents, which they both produced. Lt. Jurado never returned their documents, retaining their identifications throughout the duration of the seizure. Lt. Jurado instructed Gamboa Valadez to exit the vehicle to explain the reason for the traffic stop and informed him he would be receiving a warning, not a ticket. While Gamboa Valadez exited the vehicle and stood behind the van, Lt. Jurado asked Hernandez to produce the registration and insurance for the vehicle. Lt. Jurado then questioned Hernandez about his identity while examining his Texas identification, where he was going, what he was going to do when he arrived to his destination, how many hours or days they were planning on staying, whether he and Gamboa Valadez were just drivers, whether they were traveling with the black van that was in front of them, his prior travels, whether he knows Gamboa Valadez, his family relationship to Gamboa Valadez, how many times a month he makes the trip, and whether he goes to other destinations beside Odessa, and whether he goes to other states beside Texas. In answer to Lt. Jurado's questioning, Hernandez indicated that the purpose of the trip was to buy cars and parts in Odessa. Hernandez also indicated that he had previously traveled to Midland and Dallas, but denied travel to other states. Hernandez also indicated that they had had a flat tire on a towing

---

[3] Since the filing of the original Motion to Suppress, Reeves County has provided the dashboard camera video of the initial traffic stop. The asserted violation of Texas traffic laws described in Lt. Jurado's report is not captured on the video.

dolly and that the occupants of the black van had assisted them by taking the dolly to a tire shop. This sequence of events occurs between 13:39:29 13:42:10 on Lt. Jurado's body-cam's time-stamp. *See* Exhibit 1 and Exhibit 2.

After questioning Hernandez, Lt. Jurado proceeded to walk to the back of the van while looking through the van's rear window. As he did so, Lt. Jurado stated, "Oh yeah, He's lying there." Lt. Jurado then asked Gamboa Valadez if there was a flat tire, while indicating the cargo area of the van in apparent reference to Hernandez's information that they had had a flat tire on a towing dolly tire and that they were going to a tire shop. Gamboa Valadez responded by asking if Lt. Jurado wanted to see the tire and opened the back of the van for Lt. Jurado's examination. Upon seeing the tire, Lt. Jurado questioned Gamboa Valadez whether the tire had blown out. This sequence of events occurs between 13:42:10 and 13:42:40 on Lt. Jurado's body-cam's time-stamp. *See* Exhibit 1 and Exhibit 2.

After examining the cargo area of the van containing the flat tire, Lt. Jurado instructed Gamboa Valadez to get into the patrol vehicle, while asking him if he had any knives, grenades or bazookas. Upon entering the van, Gamboa Valadez remarked that he had never been in the front seat of a police car and Lt. Jurado responded that it was better for him to be in the front than in the back because if he had been in the back he would be under arrest. Gamboa Valadez observed that Lt. Jurado has a K9 unit in the back of the vehicle, to which Lt. Jurado responds "Of course." Lt. Jurado proceeded to ask Gamboa Valadez if he was from El Paso or Juarez, why Gamboa Valadez possessed a Mexican driver's license, whether Gamboa Valadez possessed dual citizenship, whether he spoke English, whether he understood English, Gamboa Valadez's age, whether the van belonged to Gamboa Valadez, whether the van belonged to Hernandez, whether the van belonged to a partner, Gamboa Valadez's occupation and where he collected cars from. This sequence of events occurs between 13:42:40 and 13:44:15 on Lt. Jurado's body-cam's time-stamp. *See* Exhibit 1 and Exhibit 2.

Gamboa Valadez finally asked Lt. Jurado if he was speeding, indicating Gamboa Valadez still didn't know the reason for the stop. Lt. Jurado informed Gamboa Valadez that he was stopped for following too closely. Lt. Jurado again informed Gamboa Valadez that he

would be receiving a warning, not a ticket, and that he would not need to pay anything.  This sequence occurs between 13:44:15 and 13:45:14 on Lt. Jurado's body-cam's time-stamp. *See* Exhibit 1 and Exhibit 2.

Lt. Jurado then asked Gamboa Valadez where he was going, what he was going to do once he got there, what the name of the auction was, whether this was first time Gamboa Valadez had been to Odessa, if he goes to Odessa a lot, how many trips he makes in a month, when the last time he had been in Odessa, whether he had ever been somewhere else, whether he had been to Dallas, who pays for the trip, the maximum range of the van, whether Gamboa Valadez was the only driver who drove the van, and if there were other drivers who drove the van.  In response to Lt. Jurado's repeated questioning, Gamboa Valadez answers that he has driven the "whole 20, all the 20 route," and that there are other drivers who also drive the same van. Lt. Jurado exited the police car while telling Gamboa Valadez that he was going to speak with Hernandez once again. This sequence of events occurs between 13:45:14 and 13:48:20 on Lt. Jurado's body-cam's time-stamp.  *See* Exhibit 1 and Exhibit 2.

Lt. Jurado again approached the passenger window and asked Hernandez for his phone number and whether it was a Mexican phone number and whether Hernandez has another phone number.  Lt. Jurado proceeded to write down the phone numbers provided by Hernandez. This sequence of events occurs between 13:48:20 and 13:49:20 on Lt. Jurado's body-cam's time-stamp.  *See* Exhibit 1 and Exhibit 2.

Lt. Jurado then went back to his patrol vehicle and resumed questioning Gamboa Valadez, asking him how many days or hours he was planning on staying in Odessa.  At approximately the 13:51:02 time stamp on Lt. Jurado's bodycam, he apparently attempted (for the first time since the beginning of the recording) to call his dispatch via radio.   Lt. Jurado apparently made another radio call out at 13:51:55, announcing that he was "Code 4," and repeated this again at 13:52:25.  At 13:52:35, Lt. Jurado's cell phone rang, and he answered by announcing "Hey I'm good, I guess my radio is not working," and then asked "Can you, is Garcia 10-6?"  followed by "If he, can you ask him if he's available if he can start rolling this way, please?"  Lt. Jurado then told Gamboa Valadez at 13:53:05 that he is an "anti-narco" who works on I-10 and I-20 and that he is looking for smugglers.  He asked Gamboa

Valadez if he has anything illegal, he asked him if he has a lot of money, he asked him if he has a "cuerno de chivo,"[4] any grenades or bazookas, any immigrants, any drugs, or any marijuana. Lt. Jurado repeated to Gamboa Valadez that he is an "anti-narco" who is not looking for personal-use drugs but that he is looking for "kilos." Lt. Jurado again asked if there was any marijuana, any cocaine, any crystal, any heroin, any fentanyl and whether the van has a "clavo," meaning a hidden compartment. Lt. Jurado then told Gamboa Valadez that he was the driver of the van, so that in the eyes of Texas, he was the owner of the van. This sequence of events occurs between 13:49:20 and 13:55:10 on Lt. Jurado's body-cam's time-stamp. *See* Exhibit 1 and Exhibit 2.

Lt. Jurado finally asked, at 13:55:13 "Can I check your van?" to which Gamboa Valadez answered "yes." *See* Exhibits 1 and 2. Lt. Jurado then asked Gamboa Valadez if he would follow him to his workshop because "it's a little hot." Lt. Jurado tells Gamboa Valadez that it will take 10 to 15 minutes to drive to the workshop in Pecos and that if he needs to use the bathroom or drink some water, he can do it there. Gamboa Valadez is resistant to going to the workshop, despite multiple requests from Lt. Jurado, and asked in apparent confusion if Lt. Jurado wanted him to go to Pecos to use the bathroom. After more questions, Lt. Jurado reaffirmed that Gamboa Valadez did not want to go to Pecos, preferring instead that the search be conducted at the location of the seizure. At 13:58:08 Lt. Jurado made a radio call (his radio now apparently functional) indicating that he would be at the roadside conducting a vehicle search. This portion of the sequence of events occurs between 13:55:20 and 13:58:10 on Lt. Jurado's body-cam's time-stamp. *See* Exhibit 1 and Exhibit 2.

Lt. Jurado proceeded to search the van utilizing a portable x-ray device and various tools to remove the van's upholstery and interior plastic panels. At 14:18:45, a second Sherrif's officer arrived at the scene and made contact with Lt. Jurado. The new officer notes that the vehicle's upholstery appears to be disturbed, and Lt. Jurado notes that he has pulled it out at 14:19:15. Lt. Jurado tells the other newly-arrived officer, at 14:20:12, "And when Big Dog gets here and he runs Kong, when Kong alerts, he's got no choice now."

---

[4] "Cuerno de chivo" or "goat's horn," is a Mexican slang term for an AK-47 rifle, so named because the AK-47's curved magazine bears some resemblance to a curved goat's horn.

At 14:23:54, Lt. Jurado told Gamboa Valadez that a dog was coming because his dog is "new" and "there's one coming with more experience." Gamboa Valadez twice asked how long it would take, and Lt. Jurado indicated they would have to wait. *See* Exhibit 2 from 44:14 to 45:20. The officers proceeded to remove the van's interior transmission cover but found nothing. Lt. Jurado tells the other officer at 14:27:33 "Just check what we can check until Big Dog gets here." Lt. Jurado notes, in relation to searching vehicles, that he has a set of upholstery tools from Mexico at 14:30:10. At 14:35:16, Lt. Jurado tells the other officer, "All right dog, we'll just wait for Big Dog." At 14:37:22, Lt. Jurado discontinues the search of the van and notices that his own vehicle is overheating and notes of his patrol vehicle "it's about to go down," and opens the hood to his car at 14:37:44 as the engine dies. *See* Exhibit 1.

At 14:39:20, the canine officer appeared on scene. Lt. Jurado summarized his suspicions to the canine officer and indicated that he is particularly suspicious of the car's radiator area because GMCs and Chevys have "radiator traps" and the center "hump" between the driver's and passenger's seat. Lt. Jurado told the canine handler that Gamboa Valadez had declined to go back to their workshop for a search, to which the dog handler replies at 14:42:00 "He has no other choice," indicating it is a safety issue. Lt. Jurado then told the canine hander, "Yeah, but he's like, no, just search it here, so I can't really force him. But if Kong alerts, then he has no choice," to which the canine handler replies "Yep." Lt. Jurado then instructs the canine handler, "Just make sure you detail underneath in the front and toward the radiator." Lt. Jurado then reentered his patrol vehicle and attempted to start the vehicle, without success. *See* Exhibit 1.

Upon exiting his patrol car at 14:43:55, after unsuccessfully attempting to restart his car, and before making contact with the canine handler who is standing at the front of the van (ostensibly for the dog to check the van's front-end) Lt. Jurado is heard to announce "Positive! Positive!" After the dog was permitted into the front of the van, Lt. Jurado narrated that the dog is "digging his nose" in the area between the passenger seat and the driver's seat where Lt. Jurado had previously pulled-up the van's upholstery.

Lt. Jurado then informed Gamboa Valadez that the dog had alerted to the car and

that they would have to go to the workshop to check the car. Gamboa Valadez was instructed to drive the van to a police garage in Pecos. *See* Exhibit 1. At the garage in Pecos, that van was subject to a more extensive search where cocaine was found in a makeshift table carried in the van's cargo area.

## III.    Argument

### 1. Standing and Burden

Gamboa Valadez has standing to challenge the search and seizure because he was a bailee operator of the van. *See Byrd v. United States*, 584 U.S. 395, 407(2018) ("The Court sees no reason why the expectation of privacy that comes from lawful possession and control and the attendant right to exclude would differ depending on whether the car in question is…privately owned by someone other than the person in current possession of it…"). As Exhibits 1 and 2 demonstrate, Gamboa Valadez was the van's operator as an employee of others who owned the van; the government's prosecution rests on Gamboa Valadez's status as the authorized operator of the vehicle. *See Byrd* at 412 (Fourth Amendment "standing" is subsumed under substantive Fourth Amendment doctrine; it is not a jurisdictional question that must be addressed before considering the merits of the Fourth Amendment claims.) In the event the government disputes Gamboa Valadez's Fourth Amendment standing, then Gamboa Valadez has a recognized privilege to establish standing without waving Fifth Amendment rights. *See Simmons v. United States*, 390 U.S. 377, 389-394 (1968).

As a second threshold matter, the government always bears the burden of showing that a warrantless search and seizure complied with the Fourth Amendment because warrantless searches and seizures are presumptively unreasonable. *See Katz v. United States*, 389 U.S. 347, 357 (1967).

### 2. The Initial Stop

Lt. Jurado's asserted basis for conducting the traffic stop was for "following too closely." A police officer can conduct a pretextual traffic stop without violating the Fourth Amendment, regardless of the officer's subjective intentions. *See Whren v. United States*, 517 U.S. 806, 813-14 (1996). However, the government bears the burden of establishing that a

traffic violation justifying the initial seizure occurred based on an objective standard without deferring to the officer's subjective understanding of the traffic laws. *See United State v. Cole*, 444 F.3d 688, 689 (5th Cir. 2006).   Since the filing of the original Motion to Suppress, the government has provided Lt. Jurado's dashcam footage, which does not appear to capture the asserted traffic violation.  If the government cannot demonstrate that a traffic violation actually occurred under the objective standard required by the Fifth Circuit, the government cannot meet its burden.  *See e.g., United States v. Raney*, 633 F.3d 385, 392-394 (5th Cir. 2011).

### 3. The Government's Warrantless Use of Automated Surveillance and Data Collection Systems to Track and Search the Movement of People for General Crime Control Violates the Fourth Amendment[5]

Gamboa Valadez objects that the government's warrantless use of an automated data collection system to surveil and record his physical movements, and further, to warrantlessly search the records of his physical movements recorded by the surveillance system, violates the Fourth Amendment. The Supreme Court has indicated that individuals possess a legitimate expectation of privacy in the records of their physical movements and the government's warrantless acquisition and search of such data for criminal investigation purposes violates the Fourth Amendment's warrant requirement. *See Carpenter v. United States*, 585 U.S. 296 (2018)(records of physical movement captured through cell-site location information); see also *United States v. Jones*, 565 U.S. 400, 430 (2012)(the Fourth Amendment precludes the government from warrantlessly tracking the movements of an individual's car with GPS technology).  While *Carpenter* was a cell-phone records case and *Jones* was a GPS-tracking case premised on trespass, the issues presented in this case are substantively indistinguishable for purposes of the Fourth Amendment's warrant requirement that necessitated suppression in *Carpenter* and *Jones.*

---

[5] In the context presented here, this is apparently an issue of first impression in this Circuit.

### A. The Flock System

"Flock" is a surveillance and data collection system created by the Flock Safety company. It is currently for sale to police agencies nationwide and its use is rapidly expanding. Flock Safety summarizes the system in these terms:

> Flock Safety fills the evidence gap by building infrastructure-free devices, such as cameras, that can be installed anywhere you need it, and coupled with machine learning and cloud computing, capture the license plate and state details of every car that drives by, day or night.

*See* Exhibit 4.[6]  The Flock system captures and stores multifaceted data about each vehicle in addition to license plate information:

> Using patented Vehicle FingerprintTM technology, the camera captures the vehicle make, color, type, license plate, state of the license plate, missing plate, covered plate, paper plate, and over 20 unique vehicle details like roof racks and bumper stickers.

*See* Exhibit 5.[7] The Flock system is integrated with the FBI's National Crime Information Center to provide automated alerts to law enforcement for suspect vehicles:

> Flock Safety technology integrates with the National Crime Information Center (NCIC), to provide alerts to dispatch and patrol officers on vehicle license plates associated with outstanding warrants, missing persons, and stolen vehicles. Since stolen vehicles are often used to perpetuate more crime, and the inhabitants of those vehicles are more likely to have been involved in violent crime, a stop of a stolen vehicle as a result of a Flock alert disrupts the crime cycle by removing criminal transportation and arresting suspects.

*See* Exhibit 5. Individual police officers and agencies who have access to Flock can conduct nationwide searches for vehicles in its database by entering the license plate number into a search

---

[6] Printed from https://www.flocksafety.com/blog/why-flock#:~:text=What%20evidence%20is%20needed%20to,drives%20by%2C%20day%20or%20night. (last visited on 10/5/2025),

[7]Printed from https://www.flocksafety.com/blog/why-flock#:~:text=What%20evidence%20is%20needed%20to,drives%20by%2C%20day%20or%20night. (last visited on 10/5/2025),

 https://www.flocksafety.com/blog/statement-network-sharing-use-cases-federal-cooperation (last visited on 10/5/25).

window which prompts the officer for a "search reason" in a drop-down menu, but requires no further reason or justification on the part of the officer or his agency or approval from a magistrate:

> Conducting LPR [License Plate Reader] Searches: When an agency conducts a search in the Flock system, whether only on their own cameras or on shared cameras, a "search reason" is required, every time. Flock provides options for a drop-down menu of search reasons corresponding to specific use cases, and a free text field for a case number.

*See* Exhibit 6.[8] The Flock system can also alert police automatically to suspicious activity based on the system's machine-learning capabilities:

> Flock's Safety's LPR cameras are popular because they're not only easy to use but also offer 24/7 coverage and instant alerts. Further, they provide comprehensive access to data, giving officers leads from other LPR cameras at the local, state, and national levels. This allows law enforcement to monitor the vehicle movements of suspected offenders regardless of their location.

*See* Exhibit 7.[9] Flock also makes extensive use of artificial intelligence to analyze the vehicle data it collects to permit law enforcement to search and analyze the data using pattern-recognition features:

> With these new AI-powered capabilities, Flock is revolutionizing the way law enforcement conducts investigations. By making searches more intuitive, exposing hidden criminal patterns, and providing agencies with actionable insights, we're empowering law enforcement to work smarter, not harder.

See Exhibit 8.[10]

---

[8]Printed from https://www.flocksafety.com/blog/statement-network-sharing-use-cases-federal-cooperation (last visited on 10/5/25).

[9]Printed from https://www.flocksafety.com/blog/lpr-cameras-for-law-enforcement (last visited on 10/5/25).

[10] Printed from https://www.flocksafety.com/blog/the-future-of-investigations-how-flocks-new-ai-powered-tools-are-transforming-vehicular-evidence (last visited on 10/5/25).

### B.   The Use of the Flock System In This Case

It is apparent from Lt. Jurado's statements on his bodycam and in his reports that Gamboa Valadez's seizure resulted from Lt. Jurado's and his agency's use of the Flock vehicle surveillance system.  Surveillance data obtained from the system was integral to Lt. Jurado's decision to seize Gamboa Valadez many days before the seizure ever took place. *See* Exhibit 3 (the investigation began in late July of 2025 when Lt. Jurado was conducting proactive monitoring of the Flock system for suspicious activity); *see* Exhibit 1 at 14:39:46 ("I was waiting for them on Sunday to knock them down on the money side but I never got the alert that they were coming back west until they hit our Flock camera at the split.").

The specific information that Lt. Jurado obtained from the surveillance system was multifold.  Not only did he obtain vehicle location information, he also obtained the license plate number, the times, dates, locations and directions of travel, the type of vehicle and specific information on the presence of a towed dolly attached to the vehicle and whether the dolly was empty or loaded. *See* Exhibits 1 and 3. As indicated in his reports and statements, all of this information, surveilled and recorded by Flock, was integral to his suspicions.  *Id*. This reflects that the Flock system is not merely a license-plate recorder, but a comprehensive vehicle-travel surveillance tool being employed by the government to monitor the traveling population wherever Flock is in use. This information was gathered and stored by a government-contractor third-party with a nation-wide surveillance system and was kept on a database that Lt. Jurado searched without a warrant.

That Lt. Jurado made use of the surveillance system without a warrant for purposes of proactive general crime control implicates an even stronger Fourth Amendment concern than was at issue in *Carpenter* or *Jones. See Carpenter v. United States*, 585 U.S. 296, 312 (2018)("[T]he retrospective quality of the data here gives police access to a category of information otherwise unknowable…With access to CSLI [cell site location information] the Government can now travel back in time to retrace a person's whereabouts…Unlike with the GPS device in *Jones*, police need not even know in advance whether they want to follow a particular individual or when."); *see United States v. Jones*, 565 U.S. 400, 430 (2012)(Alito, concurring: "[S]ociety's expectation has been that law enforcement agents and others would

not-and indeed, in the main, simply could not-secretly monitor and catalogue every single movement of an individual's car for a very long period."  With the advent of automated vehicle surveillance systems with nation-wide reach such as Flock, which uses a national dragnet of cameras coupled with Artificial Intelligence to record and analyze the details of "every car that drives by, day or night," the government now possesses a far greater and infinitely more powerful surveillance and tracking capability than that which was imagined in *Jones* only a few years ago.

### C.   The Use of the Flock System in this Case is Unwarranted Government Surveillance and Data Collection Which Violates the Fourth Amendment

A primary purpose of the Flock camera system is to track and record all vehicle movements within the system's range (i.e., "every car that drives by" one of the system's cameras) for use by law enforcement.  This is how Flock Safety markets and describes itself on its own terms to government agencies. *See* Paragraph A, supra. Flock Safety promotes itself as the nation's largest network of license plate cameras in the United State and obtains and stores billions of license plate vehicle "reads" every month. *See* Exhibit 9.[11] That Flock Safety is a private business entity rather than a government agency is of no import because law enforcement officers are still required to obtain a warrant to examine evidence provided to them by a private party. *Carpenter v. United States*, 585 U.S. 296, 315-16 (2018); *Walter v. United States*, 447 U.S. 649, 654-56 (1980).  Furthermore, in contrast to the telephone carriers at issue in *Carpenter*, Flock is a paid agent of the government for the explicit purpose of establishing vehicle-travel surveillance, collecting and analyzing data from the surveillance, and making the vehicle-travel surveillance information available to law enforcement without a warrant. This only strengthens the conclusion that Gamboa Valadez's seizure resulted from a massive and not-so-secret program, financed by government subscriptions, for the

---

[11] Printed from  https://www.flocksafety.com/products/license-plate-readers (last visited on 10/9/25).

suspicion-less monitoring and cataloguing of the travel movements of individuals and their vehicles, perpetuated on an industrial, national scale.

The Fourth Amendment implications presented here are far more substantial than what existed in either *Carpenter* or *Jones*. Flock or any similar system collects travel surveillance data *for the primary purpose* of warrantless, internal governmental surveillance and law enforcement. The warrantless search of travel information collected through automated surveillance in this case for proactive general crime control is unlike the warrantless CSLI database search conducted in either *Carpenter* or the warrantless installation of a GPS-tracker in *Jones.* Both of those cases were at least limited to specific and individualized case targets based on preexisting investigations, and even so, the searches were determined to have violated the Fourth Amendment. In contrast, the Flock surveillance system is a non-individualized data-collection vacuum used to surveil the entire traveling population and to automatically generate police leads. In this regard, the warrantless law enforcement access to vehicle travel surveillance data exemplified in this case implicates the worst features of both *Carpenter* and *Jones*.

Like *Carpenter*, Flock's travel surveillance is automatic, making tracking "remarkably easy, cheap, and efficient compared to traditional investigative tools. With just a click of a button, the Government can access each carrier's deep repository of information at practically no expense," effectively creating a "newfound tracking capacity that runs against everyone." *Carpenter*, 585 U.S. at 311-12. But unlike *Carpenter*, the automatic data collection utilized in this case was undertaken *for the specific purpose* of government surveillance of the traveling population for general crime control as a law enforcement tool.

Like the case in *Jones*, the use of Flock's vehicle location records permits law enforcement agents to track a vehicle's movements with great precision over an extended length of time and to receive alerts and data in real-time. But unlike the single data-point GPS tracker used in *Jones*, Flock also collects an embarrassment of detailed information on every car it encounters, and consequently, on the drivers of those vehicles, without particularity and without any suspicion whatsoever. As in this case, Flock then provides law enforcement this data warrantlessly, and utilizing cloud storage and machine learning, can

alert officers when it detects suspicious patterns. Gamboa Valadez objects that the use of this technology is itself is a warrantless search predicated on the government's use of Artificial Intelligence to surveil the entire traveling population wherever Flock or similar surveillance systems are in use, within the meaning of the Fourth Amendment.  Officers can warrantlessly search the surveillance database at their own discretion manually as well, which is another basis for Gamboa Valadez's objection.

### D. The Warrantless Search of the Flock and LPR Databases Violates the Fourth Amendment

There have been numerous cases suggesting that the police use of license plate readers or traffic cameras does not implicate a Fourth Amendment privacy issue because there is no reasonable expectation of privacy in a vehicle's license plate number.   *See e.g., Olabisiomotosho v. City of Houston,* 185 F.3d 521, 529 (5th Cir. 1999).  These cases are easily distinguishable.  The seizure of Gamboa Valadez was premised on the warrantless search of a database by Lt. Jurado that provided him with a plethora of surveillance information so that Lt. Jurado was determined to conduct a seizure even before he encountered Gamboa Valadez on August 13. *See* Exhibits 1, 2 and 3. In other words, Lt. Jurado, acting without a warrant, obtained information from a comprehensive surveillance program about the whole of Gamboa Valadez's travels, which is the same Fourth Amendment concern that yielded the outcomes in *Carpenter* and *Jones*. *See Carpenter* 585 U.S. at 310 ("A majority of this Court has already recognized that individuals have a reasonable expectation for privacy in the whole of their physical movements.")  The government will be heard to argue that Flock and similar systems obtain information about vehicles rather than people.   However, *Carpenter* itself recognizes that technological advances in the government's ability to track individual's movements through physical devices (cellphones) is the chief Fourth Amendment danger attendant to unwarranted database searches.  *See Carpenter* 585 U.S. at 309 ("The question we confront today is how to apply the Fourth Amendment to a new phenomenon:  the ability to chronicle a person's past movements though the record of his cell phone signals.")  Similarly, Gamboa Valadez's seizure is premised not on the government's ability to run a

license place through a database, but to comprehensively surveil his movements through the use of a fantastic new technology, an A.I.-networked vehicle surveillance and pattern-recognition system created by a private company and employed by the government *specifically* for this stated purpose.  The exponential growth in private and government A.I. networked surveillance and detection systems, which can comprehensively record and analyze human movement, identity, and behavior, is seemingly unbounded.  It is no longer a premise for science fiction stories.  It is here, now.  The Court should draw a strict boundary in this case, based on the Fourth Amendment.

**4. Lt. Jurado Prolonged the Stop Beyond the Time Necessary to Complete the Stop's Mission**

The allowable Fourth Amendment duration of police investigation in the context of a traffic stop is determined by the length of time needed to address the traffic violation that warranted the stop.  *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *Florida v. Royer*, 460 U.S. 491, 500 (1983). When the police suspect some other illegal activity in addition to the traffic violation, they may undertake an unrelated investigation during the traffic stop so long as the unrelated investigation does not prolong the time reasonably required to complete the issuing of a warning ticket.  *See Caballes* at 407. The diligence of the police officer in conducting the traffic stop is based on an assessment of what the seizing officer "actually did and how he did it." *See Rodriguez v. United States*, 575 U.S. 348, 357 (2015).  A traffic stop prolonged beyond the point it would take a diligent officer to expeditiously complete the traffic-based inquiry is unlawful.  *Id.*  Thus, the continued detention of defendant after legitimate justification for a traffic stop has ended is an unlawful seizure. *United States v. Dortch*, 199 F.3d 193, 198-200.

Lt. Jurado's actions during the entirety of the stop demonstrate that he was investigating contraband smuggling and that the asserted reason for the stop was not an actual concern.  *See* Exhibits 1 and 2. During at least 16 minutes of extensively questioning Gamboa Valadez and Hernandez, Lt. Jurado made no pretense of even issuing a warning or citation related to the asserted reason for the stop, even though he informed Gamboa Valadez that he was going to do so.  *See* Exhibits 1 and 2. Such tactics have been disallowed

by the Fifth Circuit in other cases. *See United States v. Macias*, 658 F.3d 509, 522 (5th Cir. 2011).

To the extent that the government will be heard to argue that Lt. Jurado could permissibly extend the duration of the stop based on the travel surveillance information he already possessed before ever making the seizure, then Lt. Jurado's actions were based on his warrantless search of the surveillance database, and Lt. Jurado prolonged the stop based on information that is inexorably intertwined with the Fourth Amendment violation.

Tellingly, the video records that Lt. Jurado was well-aware that he possessed surveillance information (e.g., that the vehicle had been to Atlanta, Georgia) which, if asked directly to Gamboa Valadez and Hernadez, could have quickly dispelled or confirmed his suspicions. He instead chose tactics calculated to prolong the stop by being imprecise in his questioning and then interpreting  Gamboa Valadez's and Hernandez's answers as lies. For example, beginning at 2:22 in Exhibit 1, the following exchange takes place between Hernandez and Lt. Jurado:

| | |
|---|---|
| Jurado: | So how many times in a month have you been on this trip? |
| Hernandez: | How? |
| Jurado: | To go to Odessa to buy parts and cars. |
| Henandez: | The whole week. |
| Jurado: | The whole week? |
| Hernandez: | Yes, we have the whole week. Yes. |
| Jurado: | But just to Odessa? Did you go to other parts or? |
| Hernandez: | To Odessa. To Midland or Dallas sometimes we go. |
| Jurado: | But here in Texas? |
| Hernandez: | Yes, here in Texas. |
| Jurado: | But you didn't go to other states or anything? |
| Herandez: | No. |
| Jurado: | No.  Well, I'll see you. |
| Hernandez: | Okay. |
| Jurado: | Oh yeah, He's lying there. |

*See* Exhibit 1 and 2.   In this exchange, Lt. Jurado asks an initial question about how many times in a month Herandez had been on "this trip."  At this point, Lt. Jurado knows that the vehicle has been to Atlanta based on the surveillance database, but he never asks Hernandez

if he himself has been to Atlanta or if anyone else has been to Atlanta while driving the van. Hernandez apparently understands the question to be about the present trip by answering "the whole week," and it is unclear if Hernandez's subsequent answers pertain to his prior travels or pertain to his prior plans for the current trip; his responses can be interpreted either way.   Rather than asking a simple clarifying question (i.e. "Have you previously traveled to Atlanta in this van?), Lt. Jurado simply concludes that Hernandez is lying without resolving the ambiguity, which then works in the government's favor as a justification to prolong the stop.

Lt. Jurado's questioning of Gamboa Valadez is similarly calculated to extend the duration of the stop for reasons unrelated to the asserted traffic purpose of the stop, based on the unwarranted surveillance information he possessed prior to the seizure.   Beginning at 6:51, the following exchange takes place:

| | |
|---|---|
| Jurado: | So when was the last time you went to Odessa? |
| Gamboa Valadez: | Last week. |
| Jurado: | Yes. |
| Gamboa Valadez: | Yes. |
| Jurado: | So you've never been anywhere else? To Dallas, to...? |
| Gamboa Valadez: | Pardon? |
| Jurado: | So you haven't been anywhere else either? |
| Gamboa Valadez: | Well, we've also been there, but with... |
| Jurado: | To Dallas, to... |
| Gamboa Valadez: | Yes, we've been to Dallas. To Fort Worth. |
| Jurado: | Abilene? |
| Gamboa Valadez: | Yes, Abilene. |
| Jurado: | Abilene too? |
| Gamboa Valadez: | Well, the whole 20, all the 20 route. |
| Jurado: | Oh really? |
| Gamboa Valadez: | Yes.  You can go further, but in general we don't go that far. |

*See* Exhibits 1 and 2. Like Hernandez's responses, these responses do not actually contradict Lt. Jurado's surveillance information that the van has been in Atlanta.   In fact, Gamboa Valadez's information that he has been on "the whole 20" route is compatible with the warrantless-acquired surveillance information because Atlanta is on Interstate 20.  Gamboa Valadez later informs Lt. Jurado that other people also drive the van.  *See* Exhibit 2 at 8:04

to 8:21. However, Lt. Jurado does not ask the direct clarifying question because any ambiguity favors prolonging the stop. Lt. Jurado knows how to play this game by concluding, (for the benefit of future review into the audio record) that Gamboa Valadez was "going to Odessa, but they were in Atlanta last week" just after he exits his patrol vehicle. *See* Exhibit 2 at 8:50. This is a textbook example of warrantless surveillance information being used to justify extending the duration of detention for reasons that have nothing to do with the asserted basis of the stop.

Lt. Jurado never made any pretense of investigating or issuing a citation for the asserted reasons for the traffic stop. None of Lt. Jurado's actions were reasonably related in scope to the circumstances that initially justified the stop, because it was never Lt. Jurado's intent to seize Gamboa Valadez for the asserted reasons to begin with. But even in the context of a pretextual stop, an officer's actions are still bound by the duration of the stop's original traffic justification. Lt. Jurado used tactics to impermissibly extend the duration of the stop well beyond what would have reasonably been necessary to complete the stop's asserted traffic violation mission.

### 5. Gamboa Valadez's Consent Was Not an Independent Act of Free Will

Consent must be both voluntary and freely given and must be an independent act of free will. *United States v. Macias*, 658 F.3d 509, 522 (5th Cir. 2011). Voluntariness is based on a six-factor test: 1) the voluntariness of the defendant's custodial status; 2) the presence of coercive police procedures; 3) the extent and level of the defendant's cooperation with the police; 4) the defendant's awareness of his right to refuse consent; 5) the defendant's education and intelligence; and 6) the defendant's belief that no incriminating evidence will be found. *See United States v. Shabazz*, 993 F.2d 431, 438 (5th Cir. 1993). No single factor is dispositive.

Gamboa Valadez is 19 years old with the equivalent of a high school education. He was seized involuntarily as a result of a traffic stop. He was immediately ordered out of his

vehicle and told to stand behind the vehicle while Lt. Jurado questioned Hernandez. He was asked about the presence of a blown tire in the back of the van and opened the van's cargo area for Lt. Jurado's inspection. He was instructed to sit in Lt. Jurado's patrol car. Upon commenting that he had never been in a police car, he was informed that it was better to be in the front than in the back because he would be under arrest if he had been placed in the back. He was questioned for approximately 16 minutes by an officer who told him that he would be receiving a warning but who made no attempt to issue a warning. He surrendered his license and identification and was asked to consent while the officer still retained the identification, without being issued a warning citation. He was never free to leave prior to being asked to consent. All of these factors indicate coercion, not voluntariness.

Nor was his consent an independent act of free will. This inquiry is based on three factors: 1) the temporal proximity of illegal conduct and consent; 2) the presence of intervening circumstances; 3) the purpose and flagrancy of the conduct. *See Macias* 658 F.3d 509, 523 (5th Cir. 2011). Each of these factors weighs in favor of Gamboa Valadez. Gamboa Hernandez's seizure and continued detention when asked for consent was the product of a causal chain that began with warrantless government surveillance, a warrantless database search for the product of that surveillance, and extensive warrantless questioning related to the product of the governmental surveillance and searches related to that surveillance. There were no intervening circumstances; Gamboa Valadez's consent was the terminal product of the chain of events that extended directly from Lt. Jurado's warrantless search of the surveillance database. The purpose and flagrancy of Lt. Jurado's conduct in conducting this seizure and questioning is inseparable from the Fourth Amendment violations that started the chain of events. In short, there was no independent act of free will.

## IV.    Conclusion

The government paid a private corporation taxpayer money to warrantlessly surveil and collect data on the traveling public. It allowed an officer to access that data, without a warrant, for purposes of proactive crime control. This is not just another drug-related traffic stop case. It is a klaxon to the head. The surveillance technology is expanding faster than

the production of tin-foil hats. Other societies tolerate and accept internal mass surveillance of their populations by their own governments. No less an authority than Wikipedia describes the Chinese experience in these terms:

> **Mass surveillance in the People's Republic of China** (PRC) is the network of monitoring systems used by the Chinese central government to monitor Chinese citizens. It is primarily conducted through the government, although corporate surveillance in connection with the Chinese government also has been reported. China monitors its citizens through Internet surveillance, camera surveillance, and through other digital technologies. The surveillance has become increasingly widespread and grown in sophistication under General Secretary of the Chinese Communist Party (CCP) Xi Jinping's administration.

*See* https://en.wikipedia.org/wiki/Mass_surveillance_in_China (last visited on 10/6/25). Russia similarly employs multiple mass surveillance systems to monitor the activities of its population. The Russian vehicle-tracking system goes by the name "Camerton":

> **CAMERTON** (Russian: Камеры (видеокамеры) + Камертон (синхронизация)) is a Russian global vehicle tracking system. Using tracking software integrated with a distributed network of radar complexes, photo-video fixation and road surveillance cameras, it identifies probable routes and places of the most frequent appearance of a particular vehicle. It was developed and implemented by the "Advanced Scientific - Research Projects" enterprise in St. Petersburg.
>
> Within the framework of the practical use of the system of the Ministry of Internal Affairs of the Russian Federation, the system has enabled identification and solving of especially grave crimes; the system is also operated by other state services and departments.

*See* https://en.wikipedia.org/wiki/Mass_surveillance_in_Russia (last visited on 10/6/25). The difference between these societies and the United States is the Fourth Amendment to the Constitution, coupled with the expectation that the government is not engaging in mass surveillance of the traveling public.

Gamboa Valadez raises multiple issues which could independently, without even reaching the warrantless use of the Flock database, require the suppression of evidence. But the government's use of automated data collection systems, coupled with

artificial intelligence, is a new provocation. If unchecked, it is bound to expand as rapidly as capital investment and infrastructure will allow. The traditional gatekeeper between government intrusion and the people has been the neutral and detached magistrate. Either the courts will jealously guard this function or it will be remembered as a quaint feature of a forgotten legal system.

Respectfully submitted,

MAUREEN SCOTT FRANCO
Federal Public Defender


/s/ Chris Carlin
CHRIS CARLIN
Supervisory Assistant Federal Public Defender
Western District of Texas
108 N. 10th Street
Alpine, Texas 79830
(432) 837-5598
(432) 837-9023 (Fax)
*Attorney for Defendant*


**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of October 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Duty AUSA Pecos
United States Attorney's Office
2500 Hwy 118 N., Ste. A200
Alpine, TX 79830

/s/ Chris Carlin
CHRIS CARLIN
Supervisory Assistant Federal Public Defender

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**PECOS DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Case Number P-25-CR-00173** |
| | § | |
| **JAVIER ALEJANDRO GAMBOA VALADEZ** | § | |
| *Defendant.* | | |

**ORDER OF SUPPRESSION**

Having considered the Defendant's Motion to Suppress, the Court orders:


Any evidence or observations, including any physical evidence or observations made by the agents or derived therefrom resulting from the seizure of the defendant, and including any post-seizure statements made by the defendant, is suppressed from use at trial.

Signed on the_____day of_____, 2025.


_____
DAVID COUNTS
UNITED STATES DISTRICT JUDGE